UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ARBON VALLEY SOLAR LLC and INTERCONNECT SOLAR DEVELOPMENT LLC,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>THOMAS & BETTS CORPORATION and JOHN & JANES DOES I–X,<br><br>　　　Defendants. | Case No. 4:16-cv-00070-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

# I. OVERVIEW

This matter comes before the Court on Plaintiffs' Motion for Leave to File a Second Amended Complaint. Dkt. 21. After the Motion became ripe for decision, the Court held oral arguments and took the Motion under advisement. Having reviewed the briefs and the record, and having considered the parties' positions set forth at oral argument, the Court finds good cause to **DENY** the Motion.

# II. FACTS

On or about December 3, 2012, Plaintiff Arbon Valley Solar LLC entered into an agreement ("Construction Agreement") with Plaintiff Interconnect Solar Development LLC ("Interconnect Solar"), under which Interconnect Solar agreed to provide all labor, materials, equipment, and services necessary to complete the construction of a solar power facility in Oneida County, Idaho ("the Solar Power Project") on behalf of Arbon

Valley Solar. Dkt. 21-1, at 3. The Solar Power Project was designed to charge five irrigation pivots and two irrigation wells, which would then serve the agricultural operations of Cranney Farms by way of a lease agreement between it and Arbon Valley Solar. *Id.* Before entering into the Construction Agreement, Interconnect Solar contacted Mr. Sammy Germany, an employee of Defendant Thomas & Betts Corporation, to seek comment and feedback on the viability of the Construction Agreement, as well as general contract oversight and project management with respect to the Solar Power Project. *Id.*

Bill Piske, an employee of Interconnect Solar, had met Mr. Germany at a solar power show in San Francisco in 2012. *Id.* at 4. At that time, Mr. Germany gave Mr. Piske his business card, which identified him as Thomas & Betts' "Market Development Manager of Renewable Energy and Power Generation for the United States and Latin America" and stated that Mr. Germany held a PhD/MBA. *Id.* This business card led Plaintiffs to believe that Mr. Germany had the authority to enter contracts on behalf of Thomas & Betts. *Id.* at 4–5. Thomas & Betts identified Mr. Germany on its published website in a manner consistent with his business card. *Id.* at 7. Plaintiffs also believed that Thomas & Betts was a large corporate enterprise with a wide variety of divisions that offered a broad scale of products and services within the solar power industry, including project management and oversight. *Id*. at 4–5.

Mr. Germany reviewed the Construction Agreement between Arbon Valley Solar and Interconnect Solar. *Id.* at 5–6. After reviewing and confirming the viability of the Construction Agreement, Mr. Germany agreed to provide (1) contractual oversight, (2)

project management, and (3) engineer procurement for the Solar Power Project. *Id.* at 6. The parties did not reduce this agreement to writing. *Id.*

In consideration of such services, Plaintiffs tendered $50,000.00 in care of Mr. Germany, who represented the sum would be deposited into an escrow account maintained by Sunjoy Power, LLC ("Sunjoy"), an entity Mr. Germany identified as a subsidiary of Thomas & Betts. *Id.* at 7. Thereafter, Mr. Germany began providing contractual oversight and project management for the Solar Power Project. *Id.* at 7–8. Mr. Germany procured engineering services by retaining Eric R. Hepburn, a professional engineer with Hepburn and Sons, LLC ("Hepburn and Sons"), for the purpose of completing the necessary engineering plans and drawings for the Solar Power Project. *Id.* at 8. Mr. Germany purportedly paid an invoice in the amount of $7,500.00 to Hepburn and Sons from the $50,000.00 tendered by Plaintiffs to Sunjoy in care of Mr. Germany. *Id.*

On March 5, 2013, while conducting contractual oversight, project management, and other duties, Mr. Germany executed an agreement ("Confidentiality Agreement") with Dynapower Company LLC ("Dynapower") on behalf of Sunjoy.[1] *Id.* Plaintiffs assert the Confidentiality Agreement was entered into for the purpose of facilitating the completion of the Solar Power Project. *Id.* On March 21, 2013, based upon Mr.

---

[1] The Confidentiality Agreement states first that it was entered into "by and between Sunjoy Power LLC, which shall include its subsidiaries and affiliates, and Dynapower Company LLC, which shall include its subsidiaries and affiliates." Dkt. 21-1, at 20. The Agreement then states, "Each of Thomas & Betts Corporation and Dynapower Company LLC are referred to herein individually as a 'Party' and collectively as the 'Parties.'" *Id.* This is the only time Thomas & Betts is mentioned in the Agreement and Thomas & Betts is not a signatory to the Agreement.

Germany's review and recommendation, Interconnect Solar purchased four 100 kilowatt Micro Power System Inverters, for a total purchase price of $240,000.00, from Dynapower. *Id.* at 9. The products were delivered in July or August of 2013. *Id.* Interconnect Solar also purchased $100,000.00 in equipment and other products for the Solar Power Project from another company, Wesco, based on the recommendation of Mr. Germany. *Id.*

In April of 2013, Randy Vigos, another employee of Thomas & Betts, traveled to Boise, Idaho, to meet with Interconnect Solar, Mr. Germany, and others. *Id.* Mr. Vigos introduced himself as a manager for Thomas & Betts and presented a business card to Interconnect Solar that identified him as "Product Specification Specialist Pacific N.W. Region Electrical Division Masters Award." *Id.* at 10. Plaintiffs assert the meeting with Mr. Vigos concerned Defendant's project management, contractual oversight, and engineer procurement duties for the Solar Power Project. *Id.* During the meeting, both Mr. Vigos and Mr. Germany stated Mr. Vigos was the representative of Thomas & Betts who would be able to assist with the Solar Power Project in the event Mr. Germany was not available. *Id.* Mr. Vigos also explained his role as a product specialist. *Id.*

On April 16, 2013, Mr. Vigos sent an e-mail through his account with Thomas & Betts to Bill Piske of Interconnect Solar to thank him for the meeting and opportunity and included a list of materials Mr. Vigos recommended that Interconnect Solar purchase for the Solar Power Project. *Id.* at 10–11. Mr. Vigos also sent the e-mail to Mr. Germany and two of Thomas & Betts' top-level executives, Dean Chafin and Tony Aimi. *Id.* at 11. Mr.

Germany, in turn, forwarded this email to Chris Castleberry, whom Plaintiffs believe is another management-level employee at Thomas & Betts. *Id.*

During July of 2013, Interconnect Solar suspected that Mr. Germany had improperly used the professional engineer stamp of Richard D. Hepburn with respect to the Solar Power Project. *Id.* at 13. Interconnect Solar confronted Mr. Germany about the authenticity of the engineering drawings and Mr. Germany responded by assuring Interconnect Solar that all matters were "above board." *Id.*

On or about December 11, 2013, an engineer with Dynapower performed an initial assessment of the Solar Power Project on behalf of Plaintiffs and concluded many deficiencies existed which rendered the Solar Power Project incompatible with the operations of Arbon Valley Solar and Cranney Farms. *Id.* Moreover, on January 13, 2014, an attorney for Hepburn and Sons sent a demand letter to Mr. Germany stating: "Our investigation demonstrates that you and SunJoy Power LLP have purposefully and with intent to deceive affixed Mr. Hepburn's professional engineer stamp issued by the Commonwealth of Massachusetts to multiple drawings which you submitted to Interconnect Solar Development LLC for use on the [Solar Power Project]." *Id.* at 13, 27.

On or about January 27, 2014, Interconnect Solar sent a written demand to Thomas & Betts proposing that the corporation authorize a competent person to take over the oversight of the Solar Power Project and negotiate the losses and damages sustained by Plaintiffs.[2] *Id.* at 13-14. Plaintiffs thereafter learned that assembling, building, and

---

[2] Plaintiffs have not provided this letter to the Court.

fabricating the Solar Power Project in reliance upon the faulty engineering plans provided by Mr. Germany rendered all of the labor, material, equipment, and services involved in the Solar Power Project incompatible and obsolete. *Id.* at 14. Plaintiffs maintain they have suffered in excess of $5,000,000.00 in losses as a direct and proximate cause of Defendant's actions. *Id.*

Plaintiffs filed their Complaint and Demand for Jury Trial in Oneida County, Idaho, on January 13, 2016. Dkt. 1-3. On February 12, 2016, Thomas & Betts removed the matter to this Court on the basis of diversity jurisdiction. Dkt. 1. On March 16, 2016, Thomas & Betts moved to dismiss Plaintiffs' Complaint and Demand for Jury Trial pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 5. Plaintiffs responded by filing an Amended Complaint on April 6, 2016. Dkt. 10. Thomas & Betts then filed a Motion to Dismiss the Amended Complaint. Dkt. 11. Judge Edward J. Lodge granted the Motion on January 19, 2017, and dismissed the First Amended Complaint without prejudice. Dkt. 20. Judge Lodge also directed Plaintiffs, if they wished to file a Second Amended Complaint, to seek leave to do so within thirty days of the issuance of his Order. *Id.* On February 20, 2017, Plaintiffs filed the instant Motion for Leave to File a Second Amended Complaint along with a proposed Second Amended Complaint. Dkt. 21. The Second Amended Complaint sets forth just one claim for relief: breach of contract and the covenant of good faith and fair dealing. Dkt. 21-1, at 14. The Motion was referred to Magistrate Judge Ronald E. Bush. On August 1, 2017, Judge Lodge vacated the referral to Judge Bush and transferred the case to the undersigned.

# III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading once "as a matter of course" before a responsive pleading is served. After that, a plaintiff may amend the complaint only with the written consent of the opposing party or with leave of the court. *Id.*; *see also DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 185 (9th Cir. 1987). However, Rule 15 also instructs the court to grant leave to amend "when justice so requires." Nevertheless, "[a] district court . . . may . . . deny leave to amend due to undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (internal quotation marks and alteration omitted). "An amendment is futile when 'no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense.'" *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (quoting *Miller v. Rykoff–Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988)).

Defendant argues that allowing the amendment would be futile because the proposed Second Amended Complaint, like the First Amended Complaint, fails to state a claim upon which relief can be granted. "When a motion to amend is opposed on the grounds that amendment would be futile, the standard of review in considering the motion is akin to that undertaken by a court in determining the sufficiency of a complaint which is challenged for failure to state a claim under the Federal Rules of Civil Procedure, Rule 12(b)(6)." *Doe v. Nevada*, 356 F. Supp. 2d 1123, 1125 (D. Nev. 2004).

"A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted). A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570. Finally, in considering a Rule 12(b)(6) motion, the Court must view the "complaint in the light most favorable to" the claimant and "accept[] all well-pleaded factual allegations as true, as well as any reasonable inference drawn from them." *Johnson*, 534 F.3d at 1122.

## IV. ANALYSIS

As stated above, Plaintiffs have asserted one claim for breach of contract and the implied covenant of good faith and fair dealing. The elements of a claim for breach of contract in Idaho are: (1) the existence of a contract between the parties; (2) breach of the contract; (3) the breach caused damages; and (4) the amount of those damages. *Ridenour v. Bank of Am., N.A.*, 23 F. Supp. 3d 1201, 1207 (D. Idaho 2014); *Mosell Equities, LLC v. Berryhill & Co.*, 297 P.3d 232, 241 (Idaho 2013). Judge Lodge dismissed the breach of contract claim asserted in the First Amended Complaint because "Plaintiffs fail[ed] to plausibly allege either the existence of a contract between Plaintiffs and Thomas & Betts, or that Mr. Germany had either express, apparent or implied authority when he agreed to provide construction management services on behalf of Thomas & Betts." Dkt. 20, at 19. In the Second Amended Complaint Plaintiffs assert that "[a] valid and binding contract

was formed and entered into by and between Plaintiffs and Defendant." Dkt. 21-1, at 14. However, the alleged facts show that Plaintiffs entered into an agreement directly with Mr. Germany, pursuant to which Mr. Germany agreed to provide (1) contractual oversight, (2) project management, and (3) engineer procurement for the solar power project. Dkt. 21-1, at 6. Plaintiffs admit that the agreement with Mr. Germany was oral. *Id.* Thus, there is no evidence or even an allegation—beyond a conclusory assertion—that Plaintiffs entered into a contract directly with Thomas & Betts. The Court must determine then whether Plaintiffs have sufficiently alleged that Mr. Germany bound Thomas & Betts to this contract with Plaintiffs.

An agent can "bind a principal to a contract the agent enters into with a third party" only if the agent has the proper authority to do so. *Intermountain Real Properties, LLC v. Draw, LLC*, 311 P.3d 734, 740 (Idaho 2013); *Bailey v. Ness*, 708 P.2d 900, 902 (Idaho 1985). An agent can have either actual or apparent authority. *Clark v. Gneiting*, 501 P.2d 278, 279–80 (Idaho 1972). "Actual authority may be either express or implied." *Id.* "Express authority is when the principal explicitly grants the agent permission to act in the principal's name." *Intermountain Real Properties*, 311 P.3d at 740. *Id.* "Implied authority is any authority that is necessary to accomplish the express authority that the principal delegated." *Id.* "Apparent authority is authority granted based on the principal's words and conduct toward a third party, not the agent's acts and statements to that third party." *Id.* A principal may also be bound by a contract entered into by its agent if the principal ratifies the contract after the agent, without prior authorization, entered into the

contract. *See Carpenter v. Payette Valley Co-op., Inc.*, 578 P.2d 1074, 1078–79 (Idaho 1978).

Plaintiffs allege that Thomas & Betts granted Mr. Germany, express, implied, and apparent authority "to contractually bind Defendant Thomas & Betts Corporation to solar power projects within his market area, including the authority to provide contractual oversight, project management, and engineer procurement for the solar power project identified in the Construction Agreement." Dkt. 21-1, at 6. Plaintiffs also suggest that Thomas & Betts ratified the contract for these services they entered into with Mr. Germany.

"As an expression of [Mr. Germany's actual or apparent] authority," Plaintiffs first cite the company equipment and tools (computers, email addresses, and telephones) Thomas & Betts issued to Mr. Germany; Mr. Germany's business card, issued by Thomas & Betts, identifying him as the Market Development Manager of Renewable Energy and Power Generation for the United States and Latin America and listing his credentials as holding a PhD/MBA; and the similar identification of Mr. Germany on Thomas & Betts' website. Dkt. 21-1, at 4–6.

As Judge Lodge previously explained, none of these facts demonstrate that Mr. Germany had the authority alleged. First, "even the lowest level employee of a modern corporation could have access to a company computer, telephone and email address;" thus, "[t]he fact Mr. Germany used Defendant's equipment and technology does not indicate he had any authority to bind Thomas & Betts to contracts with third parties." Dkt. 20, at 14. Second, "Mr. Germany's title," displayed on his business card and on

Thomas & Betts website, "provides no indication that he was a contracting officer for Thomas & Betts, and instead simply illustrates Mr. Germany was an employee of the company." *Id.* at 13. The fact that Mr. Germany holds a PhD/MBA also does not communicate that he has contracting authority. Moreover, none of these facts indicate Thomas & Betts was "involved in any type of construction oversight management as part of its business" or that it actually authorized Mr. Germany to engage in this type of business on its behalf. *Id.*

Next, in support of its allegation that Mr. Germany had actual or apparent authority to bind Thomas & Betts to contracts, Plaintiffs cite their payment of $50,000 to Mr. Germany "who represented that the monies would be deposited into an escrow account maintained by Sunjoy Power, L.L.C.," which Mr. Germany represented was a subsidiary of Thomas & Betts. Dkt. 21-1, at 7. First, Mr. Germany's representations alone do not establish his authority. Second, Plaintiffs should have conducted due diligence before tendering money in care of Mr. Germany—rather than Thomas & Betts—to a subsidiary it knew nothing about. Further, Mr. Germany's identification of himself as Sunjoy's President/Director of Engineering should have raised red flags for Plaintiffs. *See* Dkt. 21-1, at 23. Nevertheless, Plaintiffs do not allege that they ever investigated the relationship between Sunjoy and Thomas & Betts and Plaintiffs have failed to fill the hole Judge Lodge identified in the First Amended Complaint where "details as to the purported relationship between Sunjoy Power and Thomas & Betts" should have been. Dkt. 20, at 15. Thus, the Court again concludes that "[t]he fact Plaintiffs tendered payment directly to Mr. Germany, to be held in escrow by a company

other than Thomas & Betts, for services for which there is no indication Thomas & Betts provided, actually undermines Plaintiffs' agency theory," even if Mr. Germany indicated Sunjoy Power was a subsidiary of Defendant Thomas & Betts. Dkt. 20, at 15.

Plaintiffs next point to the Confidentiality Agreement between Sunjoy Power and Dynapower Company, LLC. Dkt. 21-1, at 8. This time, Plaintiffs explicitly point out that the Confidentiality Agreement mentions Thomas & Betts Corporation. Specifically, the Confidentiality Agreement provides: "Each of Thomas & Betts Corporation and Dynapower Company LLC are referred to herein individually as a 'Party' and collectively as the 'Parties.'" *Id.* This mention does not change the soundness of Judge Lodge's reasoning that "[t]he Confidentiality Agreement does not establish that Mr. Germany had authority to bind Thomas & Betts because the contracting party was Sunjoy Power, not Thomas & Betts." Dkt. 20, at 15. Again, absent from the Second Amended Complaint are any details about Sunjoy's relationship with Thomas & Betts.

Next, Plaintiffs contend that additional details about the meeting between Mr. Germany, Mr. Vigos, and Mr. Piske in Boise, Idaho establishes Mr. Germany had authority to bind Thomas & Betts. Dkt. 21-1, at 10. Plaintiffs have clarified that the three men discussed the Solar Power Project for more than an hour, during which Mr. Germany gave a "report on the status of the project" and Mr. Vigos "discuss[ed] his role as a product specialist and the type of support he could provide to the overall project." *Id.* "Mr. Vigos also mentioned that he [would] be able to sell the product at a discount since it was a 'T&B project.'" *Id.*

First, Mr. Vigos was not a principal who could grant Mr. Germany authority to act for Thomas & Betts. Thus, Mr. Vigos's statements did not give Mr. Germany authority. Second, the additional details Plaintiffs provided fail to overcome the deficiency Judge Lodge previously identified: "That Thomas & Betts allowed two of its employees to travel to Boise to meet with Interconnect Solar does not establish that Mr. Germany had authority to bind Thomas & Betts to a construction management contract." Dkt. 20, at 16.

Nevertheless, Plaintiffs contend that this meeting establishes actual and apparent authority because "Thomas & Betts placed Mr. Germany in such a situation that a person of ordinary prudence, conversant with the business usages and the nature of the particular business would be justified in believing that Mr. Germany had the authority to provide contractual oversight, project management, and engineer procurement services." *Id.* at 12–13. A court may find apparent authority when a principal "voluntarily places an agent in such a position that a person of ordinary prudence, conversant with the business usages and the nature of a particular business, is justified in believing that the agent is acting pursuant to existing authority." *Bailey*, 708 P.2d at 902. However, "[t]he third party seeking to bind the principal must use reasonable diligence to ascertain the agent's authority, and reasonable diligence encompasses a duty to inquire with the principal about the agent's authority." *Moto Tech, LLC v. KTM N. Am., Inc.*, 2014 WL 4793904, at *5 (D. Idaho Sept. 25, 2014) (internal quotation marks and alteration omitted). Moreover, "apparent authority applies to 'any set of circumstances under which it is reasonable for a third party to believe that an agency has authority, so long as the belief is traceable to manifestations of the principal.'" *Jones v. HealthSouth Treasure Valley Hosp.*, 114, 206

P.3d 473, 478 (Idaho 2009) (quoting Restatement (Third) of Agency § 2.03). Here, Plaintiffs have not alleged that they inquired with Thomas & Betts or otherwise exercised any due diligence and Plaintiffs have failed to trace their beliefs to any manifestations of Thomas & Betts, the principal.

Next, Plaintiffs assert that even if Mr. Germany did not have authority, Thomas & Betts ratified the contract between Plaintiffs and Thomas & Betts. "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act as to some or all persons, is given effect as if originally authorized by him." *Carpenter v. Payette Valley Co-op., Inc.*, 578 P.2d 1074, 1078 (Idaho 1978). "Ratification of the unauthorized acts of an agent may take many forms." *Id.* First, it may "be by way of express affirmance of the agent's act once it becomes known." *Id.* Second, it may "be implied if the principal, with full knowledge of the material facts, receives, accepts and retains benefits from the contract; remains silent, acquiesces in or fails to repudiate or disaffirm the contract; or otherwise exhibits conduct demonstrating an adoption and recognition of the agent's act as binding." *Id.* Plaintiffs argue that Thomas & Betts ratified the contract when it failed to repudiate the contract between Plaintiffs and Mr. Germany, which they became aware of, first, when Mr. Vigos copied high-level executives from Thomas & Betts on his email to Mr. Piske and, second, when Mr. Germany forwarded the email to Chris Castleberry, an individual thought to be another high-level executive. The email reads in full:

Bill,

> Thanks again for the opportunity to meet with you and Sammy in Boise to discuss the project you are building over in Idaho. Per our discussion of the applications, I have reviewed the drawings and put together a suggested list of material for you and Sammy to review.
> I selected components for the ground grid & ground ring in compression and mechanical, flexible braid (check sizing), lay in and compression lugs, PMA Conduit and mounting clamps. I used the U L Listed conduit that was the most recommended by PMA for solar applications.
> I would suggest a meeting with Holly Lane our Agency Sales Rep in Boise, and your Wesco Sales Rep to review pricing and availability of these items, some may be 3-4 weeks out, so please consider that in your planning process. I also have a 14-Ton battery crimp tool that you can borrow for the EZGround compression, and Color-Keyed lugs, you will just need to purchase the associated Dies needed for the connectors.
> Please let me know if I may be of further assistance, and thank you again for this opportunity.
>
> Randy Vigos
> Western Region Product Specialist
> . . .
> A Member of the ABB Group

Dkt. 21-1, at 25. The Court agrees with Judge Lodge that this email does not show ratification. The e-mail contains no discussion of construction oversight services provided by Mr. Germany. Rather, the email is consistent with Thomas & Betts ordinary business of providing electrical connectors. Thomas & Betts cannot be said to have "full knowledge of the material facts" of the agreement between Plaintiffs and Mr. Germany as the email does not mention the agreement at all. *See Carpenter*, 578 P.2d at 1078. Plaintiffs also have not alleged that Thomas & Betts received, accepted, or retained any benefits from the contract to provide project management services. *See id.* Plaintiffs' claim of contract ratification fails in the absence of these facts.

Plaintiffs do note in the Second Amended Complaint that the email references the fact that Thomas & Betts is "A Member of the ABB Group," an entity "comprising a

large conglomerate offering engineering and consulting services around the globe." Dkt. 21-1, at 12. However, this fact also does not change Judge Lodge's previous decision, as membership in the ABB does not show that Thomas & Betts necessary provided construction oversight services or gave Mr. Germany authority to contract on its behalf.

Finally, Plaintiffs attempted to fill several holes Judge Lodge identified in their First Amended Complaint. Plaintiffs have provided details about how they initially came into contact with Mr. Germany. Mr. Piske "met Mr. Germany at a solar power show in San Francisco in . . . 2012." *Id.* at 4. After their initial meeting, "Mr. Piske contacted Mr. Germany seeking . . . general contract oversight and project management, and engineer procurement, with respect to the solar power project . . . ." *Id.* Although Plaintiffs explain "the genesis of Plaintiffs' contact with, and relationship to, both Thomas & Betts and Mr. Germany," (*see* Dkt. 20, at 18), these facts do not strengthen Plaintiffs' claims. Rather, these facts show Plaintiffs communicated almost solely with Mr. Germany and did not exercise reasonable diligence to ascertain what authority Mr. Germany had to act on Thomas & Betts behalf. While Plaintiffs maintain they believed that Mr. Germany had authority to act as Thomas & Betts agent and that Thomas & Betts provided construction oversight services, they assert no steps they took to confirm these facts.

In sum, Plaintiffs have added little to the Second Amended Complaint to strengthen their contract claim. Despite the addition of new details, Plaintiffs still fail to plausibly allege that Mr. Germany had either actual or apparent authority to act on Thomas & Betts behalf or that Thomas & Betts ratified the contract between Plaintiffs and Mr. Germany. Accordingly, the Court finds it would be futile to allow Plaintiffs to

amend their complaint again as the proposed Second Amended Complaint still fails to state a claim upon which the Court could grant relief and, if filed, would be subject to dismissal under a Rule 12(b)(6) motion.

## ORDER

IT IS HEREBY ORDERED:

1. Plaintiffs' Motion for Leave to File a Second Amended Complaint (Dkt. 21) is DENIED WITH PREJUDICE.

2. The Court will enter judgment separately in accordance with Fed. R. Civ. P. 58.

DATED: November 21, 2017

_____
David C. Nye
U.S. District Court Judge